CA NO. 22-50064

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

FRANCISCO LUCAS, Jr.,

        Defendant-Appellant.

DC NO. 8:21-cr-00017-JVS-1

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JAMES V. SELNA
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
SONAM HENDERSON
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081
Email:  Sonam_Henderson@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND QUESTION PRESENTED ....................................1

II.    STATEMENT OF ADDENDUM ..................................................................3

III.   STATEMENT OF THE CASE .....................................................................3

    A.     Jurisdiction ..........................................................................................3

    B.     Custody Status .....................................................................................3

    C.     Background ...........................................................................................4

         1.     Police found images of Lucas with a pistol and an extended-length magazine during a probation search; Lucas subsequently pleaded guilty to violating 18 U.S.C. §922(g)......4

         2.     At sentencing, the chief issue was whether Lucas should be subject to the heightened base offense level for possessing a gun with a large-capacity magazine capable of accepting more than 15 rounds....................................................................4

         3.     The defense expert report pointed to the existence of extended-length magazines like the one seen with Lucas that are not capable of accepting more than 15 rounds. .............5

         4.     The government expert conceded that, without physically examining the magazine, he was *not* able to determine if it could accept more than 15 rounds. .............................................6

         5.     United States Probation recommended not applying the heightened base offense level because there was insufficient evidence that the magazine could hold more than 15 rounds.....7

         6.     The district court nonetheless found that the heightened base offense level applied. ..........................................................8

IV.   SUMMARY OF ARGUMENT....................................................................9

V.    STANDARD OF REVIEW .......................................................................10

i

# TABLE OF CONTENTS

**Page**

VI.  ARGUMENT ...................................................................................10

    A.  The district court committed clear error when it found that Lucas's magazine could accept more than 15 rounds. ....................................10

        1.  Because the government's own expert said that it was not possible to determine from the images whether the magazine could accept more than 15 rounds, the district court's finding was implausible and without support from inferences that could be drawn from the record. .....................12

        2.  The district court erroneously focused exclusively on magazines with blockers, ignoring the extended-length magazines designed to hold only 10 rounds identified by the government expert....................................................................14

    B.  The district court also committed legal error by considering whether it was possible to modify a magazine with a blocker to accept more than 15 rounds, not on how many rounds it could accept "at the time of the offense." ....................................................16

        1.  The enhancement is backward-looking, and requires the district court to consider a magazine's capabilities "at the time of the offense." ................................................................16

        2.  The district court's reliance on Eighth Circuit cases about *firearms* was error, since unlike magazines, the Guidelines define firearms by what they are "designed" to do, not what they actually could do at the time of the offense. .....................19

VII.  CONCLUSION................................................................................22

CERTIFICATE OF RELATED CASES .................................................23

CERTIFICATE OF COMPLIANCE.......................................................24

INDEX OF ADDENDUM.......................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Cullen v. Pinholster*,
563 U.S. 170 (2011).............................................................17, 18, 19

*United States v. Allen*,
373 F. App'x 711 (9th Cir. 2010) .......................................14

*United States v. Cazares*,
121 F.3d 1241 (9th Cir. 1997) ...........................................14

*United States v. Davis*,
668 F.3d 576 (8th Cir. 2012) .............................................20

*United States v. Decelles*,
282 F. App'x 613 (9th Cir. 2008) .......................................14

*United States v. Diaz*,
838 F.3d 968 (9th Cir. 2016) ..............................................18, 19

*United States v. Fischer*,
232 F. App'x 722 (9th Cir. 2007) .......................................14

*United States v. Gasca-Ruiz*,
852 F.3d 1167 (9th Cir. 2017) (en banc) ...........................10

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc) .......................10, 13

*United States v. Jimison*,
493 F.3d 1148 (9th Cir. 2007) ...........................................14

*United States v. King*,
378 F. App'x 748 (9th Cir. 2010) .......................................14

*United States v. Luca*,
183 F.3d 1018 (9th Cir. 1999) ...........................................14

*United States v. Seesing*,
234 F.3d 456 (9th Cir. 2000) .............................................11

*United States v. Torres*,
489 F. App'x 968 (8th Cir. 2012).......................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Statutes**

18 U.S.C. § 921 ..............................................................................20, 21

18 U.S.C. § 922 ....................................................................................3, 4

18 U.S.C. §3231 ......................................................................................3

18 U.S.C. §3742 ......................................................................................3

21 U.S.C. § 841 ................................................................................18, 19

28 U.S.C. §1291 ......................................................................................3

28 U.S.C. § 2254 ...................................................................................17

**Federal Sentencing Guidelines**

USSG § 2K2.1 ...............................................................................*passim*

**State Statutes**

Cal. Penal Code § 1170.18 ....................................................................18

## I.  INTRODUCTION AND QUESTION PRESENTED

This case is about the district court erroneously finding that a Guidelines sentencing enhancement applied, despite the government's own expert saying that there was insufficient information to find the relevant fact for applying the enhancement.

After a probation search turned up photos and a video of appellant Francisco Lucas, Jr., holding a pistol, Lucas was prosecuted for illegally possessing the gun. Lucas pleaded guilty, notwithstanding that the government never recovered the gun or its magazine.  At sentencing, the government argued for the heightened Guidelines offense level that applies when, at the time of the offense, a firearm was attached to or in close proximity to a large-capacity magazine that could accept more than 15 rounds of ammunition.  The government pointed to images showing that Lucas's magazine extended well below the frame of the gun, claiming that such extended-length magazines are necessarily large-capacity.  But its own expert, an ATF agent, said that magazine manufacturers make extended-length magazines indistinguishable from the one in the images that nonetheless hold only 10 rounds.  The ATF expert concluded that without examining the magazine, he could not tell if the magazine Lucas possessed in the images was a high-capacity magazine capable of accepting more than 15 rounds, or just an extended-length magazine with a capacity of 10 rounds.

1

The district court, however, ignored that part of the expert's report, instead focusing on a third category of extended-length magazines: magazines that originally were designed to hold more than 15 rounds, but which have a "blocker" installed to limit the capacity to 10 rounds. The district court reasoned that since the expert said it would be reasonably easy to disassemble such a magazine and remove the blocker, even if a blocker was installed at the time of the offense, such a magazine would still qualify as a large-capacity magazine.

These circumstances raise the following questions for review by this Court:

**A.** Whether the district court clearly erred at sentencing by finding that the magazine could accept more than 15 rounds of ammunition, where the government's own expert said that without examining the magazine, he was not able to determine if it could hold more than 10 rounds?

**B.** Even if the district court had not erred by focusing on blockers and ignoring the separate category of extended magazines designed to hold only 10 rounds that the government's expert identified, whether, where the Guidelines direct that the enhancement should only apply if "at the time of the offense" the firearm "had attached" or "was in close proximity to" a magazine that "could accept" more than 15 rounds, the district court erred by analyzing not what a magazine with a blocker would have been able to accept at the time of the offense, but what it would have been able to accept if it were modified to remove the blocker?

2

## II. STATEMENT OF ADDENDUM

Pertinent authority is set forth in the addendum to this brief.

## III. STATEMENT OF THE CASE

### A. Jurisdiction

This appeal is from a judgment rendered on March 21, 2022, by the Honorable James V. Selna, United States District Judge, sentencing Lucas to a 57-month term of imprisonment. (1-ER-3.)[1] The district court entered judgment after Lucas pleaded guilty to one count of possessing a gun as a prohibited person in violation of 18 U.S.C. § 922(g). (1-ER-3.) Lucas filed a timely notice of appeal on March 25, 2022. (1-ER-108.) The district court had jurisdiction under 18 U.S.C. §3231; this Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

### B. Custody Status

Lucas is in custody serving the sentence imposed in this case. According to the Bureau of Prisons, his expected release date is February 9, 2025.

---

[1] "1-ER- _" refers to the applicable page in the single-volume Excerpts of Record. "PSR-_" refers to the applicable page in the volume of Appellant's confidential sentencing documents. "Video Ex. 2" and "Audio Ex. 3" refer to recordings that the government submitted as exhibits to its sentencing papers. The recordings are the subject of an unopposed Motion to Transmit Physical Exhibits filed concurrently with this brief.

C.     **Background**

1.     **Police found images of Lucas with a pistol and an extended-length magazine during a probation search; Lucas subsequently pleaded guilty to violating 18 U.S.C. §922(g).**

The genesis of this case was a November 2020 probation search of Lucas's phone.  That search turned up photographs and video appearing to show Lucas holding a Glock pistol with an oversized magazine.  (PSR-16-17.)  The pistol's serial number was visible in at least one image.  (PSR-17.)  The gun had been reported stolen six months earlier.  (PSR-16.)

Law enforcement never recovered or examined the gun.  (1-ER-43.) Nonetheless, the federal government subsequently prosecuted Lucas for violating 18 U.S.C. §922(g), based on his two prior felony convictions and the images of him apparently possessing the gun.  (1-ER-106-07.)

Lucas pleaded guilty pursuant to a plea agreement.  That agreement included a limited waiver of appeal through which Lucas gave up many appeal rights regarding his sentence if his sentence was 41 months or less.  (1-ER-99.)

2.     **At sentencing, the chief issue was whether Lucas should be subject to the heightened base offense level for possessing a gun with a large-capacity magazine capable of accepting more than 15 rounds.**

The main issue at sentencing concerned the offense level, and in particular whether Lucas should be subject to the starting base offense level of 14 for § 922(g) offenses, or the heightened Guidelines base offense level of 20 for a §

4

922(g) offense involving a semiautomatic firearm capable of accepting a large-capacity magazine.  (1-ER-10; 1-ER-16-22; 1-ER-42-43; 1-ER-65.)  *See also* USSG § 2K2.1(a)(4)(B)(i)(I) & § 2K2.1(a)(6)(A).  That question, in turn, rested on whether the magazine depicted in the images could, at the time of the offense, accept more than 15 rounds of ammunition.  (1-ER-43-44; 1-ER-65-67.)  *See also* USSG § 2K2.1, app. n.2.

The six-level difference between the two base offense levels translated to a 30-37 month difference in Lucas's Guidelines range.  (1-ER-11; PSR-15.)  Because of the disproportionate effect of the enhancement, Lucas argued that the government needed to prove it by clear and convincing evidence, rather than the usual preponderance standard.  (1-ER-33.)  At sentencing, the government allowed that the clear and convincing evidence standard "probably" applied.  (1-ER-22.)

### 3. The defense expert report pointed to the existence of extended-length magazines like the one seen with Lucas that are not capable of accepting more than 15 rounds.

In its sentencing position, the defense submitted an expert report in which the expert acknowledged that the magazine visible in the images and video was longer than a standard magazine and that it superficially resembled a large-capacity magazine that could accept more than 15 rounds.  (1-ER-76.)  However, the defense expert also noted that California does not permit the sale of magazines with more than 10 rounds, and that, to cater to customers who prefer the look of an oversized magazine, gun companies produce for the California market extended-

length magazines which outwardly appear to be large-capacity magazines, but which cannot actually accept more than 10 rounds.  (1-ER-76-77.)

### 4. The government expert conceded that, without physically examining the magazine, he was *not* able to determine if it could accept more than 15 rounds.

The government produced an expert report from Special Agent Alexander Liwienski of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  (1-ER-60.)  Special Agent Liwienski stated that the type of gun depicted in the images was a Glock model 22; that the standard magazine for that model held up to 15 rounds; and that the magazine depicted was longer than the frame of the gun, meaning its outward features were consistent with magazines capable of accepting more than 15 rounds of ammunition.  (1-ER-60; *see also* Video Ex. 2.)

Liwienski, however, also conceded that in addition to large-capacity extended-length magazines, there were available for sale extended-length magazines made to accept only 10 rounds of ammunition.  (1-ER-61.)  Indeed, Liwienski conceded that he was unable to tell whether Lucas's extended-length magazine was a large-capacity magazine or a 10-round magazine.  He wrote: "[w]ithout physical examination, it cannot be conclusively determined whether the magazine seen in photographs and video is capable of accepting mor tha[n] 15 rounds of ammunition or only ten (10) rounds."  (1-ER-61.)

Special Agent Liwienski also noted a third category of extended-length magazines: those with "original capacit[ies]" of more than 10 rounds that have

been equipped with removable blockers.  (1-ER-61.)  When a blocker is in place, such a magazine only accepts 10 bullets, but when the blocker is removed, the magazine accepts more than 15 rounds.  (1-ER-61.)  Liwienski stated that such blockers can be removed by disassembling the magazine and removing the floorplate, but he did not specify whether doing so requires specialized skills or tools.  (1-ER-61.)  Liwienski stated that despite the existence of such blockers, he had not, in his many California investigations, encountered a large-capacity magazine with a blocker installed.  (1-ER-61.)

### 5. United States Probation recommended not applying the heightened base offense level because there was insufficient evidence that the magazine could hold more than 15 rounds.

In the presentence report, the Probation Office recommended the lower base offense level of 14 because it could not determine whether the magazine could accept more than 15 rounds, but it also noted that it had yet to receive the expert reports.  (PSR 17 n.1.)  After receiving the expert reports and other party submissions, the Probation Office submitted an Addendum stating that there was still insufficient information to determine whether the magazine depicted in the photographs and videos could actually accept more than 15 rounds.  (PSR-3.)  As such, it maintained the correct offense level was 14.  (PSR-3.)

### 6. The district court nonetheless found that the heightened base offense level applied.

At sentencing, the district court assumed that the clear and convincing evidence standard applied. (1-ER-10.) It, however, broke with Probation and sided with the government with regard to which base offense level to apply. (1-ER-10.) The court utterly ignored the extended-length magazines described by Special Agent Liwienski that look like large-capacity magazines but which accept only 10 rounds. (1-ER-10; 1-ER-61.) It similarly ignored Liwienski's admission that he could not tell from the images if Lucas's magazine could accept only 10 rounds or more than 15. (1-ER-10; 1-ER-61.) Instead, it focused exclusively on the third category of extended-length magazines discussed by Liwienski: those fitted with removable blockers. (1-ER-10.) It found that even if there had been a blocker, such a magazine would nonetheless "be susceptible to easy conversion," and so would have qualified as a large-capacity magazine. (1-ER-10.)

Having determined that base level 20 applied, the district court imposed an additional 2 level enhancement for the gun being stolen, removed 3 levels for acceptance of responsibility, and calculated the Guidelines range as 63-78 months. (1-ER-10-11.) It then varied down one offense level to account for Lucas's difficult and impoverished childhood in gang neighborhoods. (1-ER-25.) It calculated the final Guidelines range as 57 to 71 months, and imposed a sentence of 57 months. (1-ER-25.)

8

## IV.  SUMMARY OF ARGUMENT

**A.** The district court committed clear error by finding Lucas's magazine could accept more than 15 rounds.  The magazine was never recovered, and the government's own expert said that it was not possible to determine without physical examination whether the magazine could accept more than 15 rounds or was one designed to hold only 10 rounds.  Accordingly, the district court's finding was implausible and without support from inferences that could be drawn from the record.  The district court appears to have reached that erroneous conclusion by focusing exclusively on the expert's separate discussion of magazines made to accept more than 15 rounds but equipped with removable blockers.

**B.**    Even if the district court had not erred by focusing only on magazines with blockers, its would nonetheless have committed significant legal error in its analysis.  Its conclusion that even a magazine with a blocker would qualify as large-capacity was based on its conclusion that a magazine with a blocker could be relatively easily modified to remove the blocker and increase the capacity above 15 rounds.  But the language of the enhancement is backward-looking, and required the district court to consider the magazine's capabilities "at the time of the offense," not what those capabilities would be if it was subsequently modified.  The district court's reliance on Eighth Circuit cases about firearms was error, since unlike magazines, the Guidelines define firearms by what they are "designed" to do, not what they actually could do at the time of the offense.

## V.  STANDARD OF REVIEW

When reviewing the application of a provision of the Sentencing Guidelines, this Court reviews de novo whether the district court selected the correct provision and whether it correctly interpreted that provision.  *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc).  If the sentencing court identified the correct Guidelines provision and properly interpreted that provision, its application of the provision to the facts of a given case is reviewed for abuse of discretion, and its factual findings for clear error.  *Id.*  A district court commits clear error when its findings are illogical, implausible, or without support in inferences that may be drawn from facts in the record.  *United States v. Hinkson*, 585 F.3d 1247, 1251, 1261-63 (9th Cir. 2009) (en banc).

## VI.  ARGUMENT

**A.  The district court committed clear error when it found that Lucas's magazine could accept more than 15 rounds.**

In order for the heightened base offense level of 20 under § 2K2.1(a)(4)(B)(i)(I) & (ii)(I) to apply, a defendant must be a prohibited person whose offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine."  *See* USSG § 2K2.1(a)(4)(B).  As the committee notes explain,

> a "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had

> attached to it a magazine or similar device that could
> accept more than 15 rounds of ammunition; or (B) a
> magazine or similar device that could accept more than
> 15 rounds of ammunition was in close proximity to the
> firearm.

*See* USSG § 2K2.1 app. n.2.  Here, the issue for the district court was whether the magazine that was attached and in proximity to the firearm in the video and images "could accept more than 15 rounds of ammunition" at the time of the offense.  The district court's determination that the magazine could accept more than 15 rounds was without support in inferences that could be drawn from the record, and so clear error.

The burden was on the government to prove that the magazine was one that could accept more than 15 rounds of ammunition.  *United States v. Seesing*, 234 F.3d 456, 459-60 (9th Cir. 2000).  Because the government did not have the magazine and so could not examine it, the district court was left to rely for the enhancement on photo and video images depicting the magazine, and Special Agent Liwienski's expert report.[2]  But Liwienski's report makes clear that the

---

[2] The government also included with its position a recording of an apparent jail call in which two people who are not Lucas have a conversation in which ones says, "Choko's here for a burner, he's here for a 40 Glock with a 30 round stick." (Audio Ex. 3 at 7:55-8:15.)  According to the PSR, Choko is an alias used by Lucas.  (PSR-14.)  The district court does not appear to have relied on the call, however.  (1-ER-10; 1-ER-18-21.)  That was appropriate: the government made no attempt whatsoever to authenticate the recording, declining to provide a declaration or other evidence describing when the recording was made or who the speakers were.  Instead, the government attorney simply asserted in the sentencing position

magazine visible in the images and video is consistent with at least three categories of extended-length magazines, one of which cannot accept more than 10-rounds under any circumstances and one of which would require disassembling and modifying the magazine to make it capable of accepting more than 15 rounds of ammunition.  Since the government's own expert could not determine which type of magazine he was looking at, the district court had no basis from which to conclude that the magazine could accept more than 15 rounds.

      **1.**    **Because the government's own expert said that it was not possible to determine from the images whether the magazine could accept more than 15 rounds, the district court's finding was implausible and without support from inferences that could be drawn from the record.**

The photos and video depict a magazine extending several inches below the frame of the pistol.  (1-ER-50; 1-ER-60.)  Glock manufactures magazines for that type of pistol that hold 15 rounds and extend only a quarter of an inch below the frame.  (1-ER-60.)  Thus, Special Agent Liwienski stated that "[f]eatures of the firearm magazine in the phot[o]s and video are consistent with a pistol magazine . . . capable of accepting more than 15 rounds of ammunition."  (1-ER-60.)

---

brief that the call was between two members of Lucas's gang.  (1-ER-44; *see also* 1-ER-34 (defense objecting based on foundational issues).)  Thus, there is no actual evidence in the record about: who the callers were, or from which one could ascertain that they were talking about Lucas and not some other "Choko"; whether the call took place at a time when Lucas was sharing a facility with one of the callers; and whether, even if they were talking about Lucas, there was reason to conclude that they had accurate information about his magazine.

As Special Agent Liwienski properly acknowledged, however, that was *not* the end of the inquiry. (1-ER-161.) Instead, in addition to extended-length magazines that hold more than 15 rounds, Liwienski was also "aware that extended length magazines capable of accepting only ten (10) rounds of ammunition have been available for sale," and that those 10-round extended magazines "would be similar in appearance to the magazine in the examined photographs and video." (1-ER-161.) Because of the similarities in appearance between the extended magazines made to hold only 10 rounds, and those made to hold more than 15 rounds, Special Agent Liwienski opined that, "[w]ithout physical examination, it cannot be conclusively determined whether the magazine seen in photographs and video is capable of accepting more tha[n] 15 rounds of ammunition or only ten (10) rounds of ammunition." (1-ER-161.)

*That* should have been the end of the inquiry. The government's own expert gave an opinion that the available information was insufficient to reach a conclusion about whether the magazine was capable of accepting more than 10 rounds. (1-ER-61.) But notwithstanding that opinion—and without acknowledging that opinion—the district court found that the magazine was capable of accepting more than 15 rounds. (1-ER-10.) In light of Liwienski's opinion, that finding was implausible and without support in inferences that may be drawn from facts in the record, and so clear error. *See Hinkson*, 585 F.3d at 1251. Despite the discretion afforded district courts in sentencing, this Court has

13

not hesitated to hold that a district court errs when it imposes an enhancement

without evidence from which to infer a fact necessary to that enhancement.[3]

> **2.      The district court erroneously focused exclusively on magazines with blockers, ignoring the extended-length magazines designed to hold only 10 rounds identified by the government expert.**

In its findings, the district court wholly ignored Special Agent Liwienski's

statement that "[w]ithout physical examination, it cannot be conclusively

determined whether the magazine seen in photographs and video is capable of

accepting more tha[n] 15 rounds of ammunition or only ten (10) rounds of

ammunition."  (1-ER-10; 1-ER-61.)  Instead, it focused on Liwienski's mention of

---

[3] *See, e.g.*, *United States v. Jimison*, 493 F.3d 1148, 1150 (9th Cir. 2007) (defendant saying he was "going to go Rambo" did not establish that he wanted to shoot it out with police, since he could just as easily have been making empty statements to blow off steam); *United States v. Luca*, 183 F.3d 1018, 1026 (9th Cir. 1999) (insufficient evidence that church members were "particularly susceptible" to predation by church leader defendant); *United States v. Cazares*, 121 F.3d 1241, 1248 (9th Cir. 1997) (reversing enhancement for possession of gun in drug conspiracy, where government did not establish that member of the conspiracy possessed guns); *United States v. Allen*, 373 F. App'x 711, 713 (9th Cir. 2010) (some "highly circumstantial" evidence not enough to prove that defendant involved in a shooting); *United States v. Decelles*, 282 F. App'x 613, 614-15 (9th Cir. 2008) (mere fact defendants stole firearms during a burglary insufficient to show that the firearms emboldened them in their commission of the robbery); *United States v. Fischer*, 232 F. App'x 722, 724 (9th Cir. 2007) (record did not support finding that defendant distributed 22 ounces of cocaine where evidence was that some was for personal use); *United States v. King*, 378 F. App'x 748, 750 (9th Cir. 2010) (inadequate information about case agent's qualifications to distinguish child pornography from child erotica in applying number of images enhancement).

a different category of extended-length magazines: those designed to hold more than 15 rounds but with removable blockers installed to limit them to 10 rounds. Its questions at the hearing focused on blockers, even while defense counsel noted that there were more permanent forms of modifications like rivets and different designs of extended magazine that would not take more than 15 rounds. (*See* 1-ER-17-18 (district court asking "Is it your position that the inclusion of a blocker is a permanent modification?" and noting that the government's expert said that "there are very few" magazines with blockers).) Even more emphatically, in the district court's tentative sentencing ruling, published with the minutes of the hearing, it reasoned: "[a]t a minimum, even if the weapon were a 'California Compliant' by virtue of a blocker, it was susceptible to easy conversion to accept a high capacity magazine." (1-ER-10.)[4]

That reasoning completely excluded the category of 10-round extended magazines not using blockers that Special Agent Liwienski identified in his report. Liwienski did not opine that those magazines were susceptible to easy conversion. He also did not claim that they were rare.[5] But by focusing exclusively on

---

[4] Presumably it meant that meant that the *magazine* (as opposed to the "weapon") was compliant by virtue of a blocker, and was susceptible to being converted to be able to accept more than 15 rounds of ammunition.

[5] Rather his report suggested only that blockers were rare, stating, "[o]f the extended magazines examined, SA Liwienski has never encountered one with a blocker installed in it to limit the ammunition capacity." (1-ER-61.)

removable blockers and their asserted rarity, the district court ignored that other category of non-blocker, 10-round extended magazines.  More importantly, it ignored that Agent Liwienski stated that that "[w]ithout physical examination" he could not determine whether the magazine in the images was "capable of accepting more tha[n] 15 rounds of ammunition or only ten (10) rounds of ammunition."  (1-ER-61.)  That was clear error.

**B.    The district court also committed legal error by considering whether it was possible to modify a magazine with a blocker to accept more than 15 rounds, not on how many rounds it could accept "at the time of the offense."**

The district court did not err only by ignoring that the government's own expert had said that he could there were extended-length magazines capable only of accepting 10 rounds that did not use removable blockers, and that he could not determine if the magazine in the images held 10 or more than 15 rounds.  Even within its discussion of magazines with blockers, the district court committed legal error by assuming that it did not matter what the magazine's capacity was at the time of the offense, so long as it could be modified to hold more ammunition.

**1.    The enhancement is backward-looking, and requires the district court to consider a magazine's capabilities "at the time of the offense."**

In opting to apply the enhancement, the district court reasoned that even if the magazine had had a blocker, such that at the time of the offense it could only hold 10 bullets, it would have been "susceptible to easy conversion" to accept

16

more rounds.  (1-ER-10.)  This was presumably based on Agent Liwienski's statements that blockers can be "easily removed" by disassembling the magazine and removing the floor plate.  (1-ER-61.)[6]

But the focus on what the magazine could be modified to do addressed the wrong question.  The enhancement does not ask whether the magazine was such that with modifications it would become capable of accepting more than 15 rounds.  Rather, as explained in the committee notes, the relevant portion of the enhancement asks a precise, historical question that is phrased in the past tense: whether "*at the time of the offense* (A) the firearm *had attached* to it a magazine or similar device that *could accept* more than 15 rounds of ammunition; or (B) a magazine or similar device that *could accept* more than 15 rounds of ammunition *was* in close proximity to the firearm."  *See* USSG § 2K2.1 app. n. 2 (emphasis added).

When a provision demands a "backward-looking" inquiry into the state of affairs at the time of the offense, it indicates that the court should not look at potential future developments, like a modification.  The Supreme Court made that point in *Cullen v. Pinholster*, 563 U.S. 170 (2011).  There, the Court considered the language of 28 U.S.C. § 2254(d)(1), and whether, when considering if a state

---

[6] Liwienski did not expound on his statement that such magazines are easily modifiable, for instance not specifying whether a layperson could do the work with ordinary tools or whether specialized tools and skills would be required.

17

court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," a federal court could consider the record as modified by subsequent evidence adduced in federal court, or whether it was limited to the unmodified record from state court, *id.* at 181-82. This Court held that because the verbs "resulted" and "involved," were written "in the past tense," the statute was "backward-looking," and so only the unmodified record that had actually been before the state court could be considered. *Id.* at 182.

This Court echoed that reasoning in *United States v. Diaz*, 838 F.3d 968 (9th Cir. 2016). That case involved a defendant being sentenced under the then-current recidivism provisions of 21 U.S.C. § 841. *Id.* at 971. That since-amended provision "impose[d] a mandatory life sentence if a defendant 'commits [a violation of § 841] after two or more prior convictions for a felony drug offense have become final.'" *Id.* at 972 (quoting the then-current language of 21 U.S.C. § 841(b)(1)(A)). The defendant had two convictions that had been felonies at the time he was convicted, but which he was later able to reclassify as misdemeanors under California's Proposition 47. *Id.* at 971; *see also* Cal. Penal Code § 1170.18 (codifying Proposition 47). This Court held that he could not benefit from that modification, because the language of the statute—asking whether the defendant committed a new drug offense after two prior drug felony convictions "have become final"—was "backward-looking." *Diaz*, 838 F.3d at 973. Since the modification did "not change the historical fact that [the appellant] violated § 841

18

'after two or more prior convictions for a felony drug offense [had] become final,'" the modification could not affect his sentence.  *Id.* at 971 (quoting 21 U.S.C. § 841(b)(1)(A)).

Like the provisions at issue in *Pinholster* and *Diaz*, the language here is determinedly backward-looking.  In addition to speaking "in the past tense," *Pinholster*, 563 U.S. at 182, with verbs and verb constructions such as "was," "had attached," "could accept,"[7] the notes directly tell a sentencing court to consider the state of things "at the time of the offense."  *See* USSG § 2K2.1 app. n. 2.  Hence, it misses the point to reason that it would be possible to modify a magazine with a blocker to accept more than 10 rounds: under a correct reading of the Guideline, the question is whether, at the time of the offense, the magazine could accept more than 15 rounds, not what it might be modified to accept.

> ### 2. The district court's reliance on Eighth Circuit cases about *firearms* was error, since unlike magazines, the Guidelines define firearms by what they are "designed" to do, not what they actually could do at the time of the offense.

In reaching a contrary conclusion, the district court relied on two Eighth Circuit cases about whether guns that were inoperable or which had to be modified to accept large-capacity magazines qualified as "firearms" under the enhancement.

---

[7] In this context, "could" is the past-tense of "can," and used to indicate an "ability or permission in the past."  *See* "Could," American Heritage Dictionary of the English Language (5th. Ed.), available at https://ahdictionary.com/.

Unlike magazines, however, firearms are defined in the text of the enhancement by reference to 18 U.S.C. § 921(a)(3), which defines a firearm in terms of what the weapon (or even just its frame) was "designed to" do, not what it could actually do at the time of the offense. *See* USSG § 2K2.1 app. n. 1; 18 U.S.C. § 921(a)(3). Since the enhancement does not ask what a magazine was designed to do, but only whether at the time of the offense it could accept 15 or more rounds, *see* USSG § 2K2.1 app. n. 2, those Eighth Circuit cases about "firearms" are inapposite.

In *United States v. Davis*, 668 F.3d 576 (8th Cir. 2012), the defendant was apprehended with a semiautomatic pistol and a 30-round magazine fit to that pistol, *id.* at 576-78. He did not dispute the capacity of the magazine, but rather argued that the enhancement should not apply because the gun was missing its trigger, and so inoperable at the time of the offense. *Id.* The Eighth Circuit rejected that argument. It reasoned that the Guideline gives the term "firearm" the definition in 18 U.S.C. § 921(a)(3), and that statute includes weapons "designed to" to expel a projectile, whether or not they are in operable form or not. *Id.* at 977 (quoting 18 U.S.C. § 921(a)(3)); *see also* USSG § 2K2.1 app. n. 1 (definitions). Indeed, the term "firearm" includes even just the "frame or receiver" of such a weapon. 18 U.S.C. § 921(a)(3)(B). Because the Guideline requires only that a firearm be designed to fire a projectile, that the weapon was inoperable at the time of the defense did not disqualify it as a "firearm." *Davis*, 668 F.3d at 579.

20

By contrast, this case has nothing to with how "firearm" is defined by statute. The "designed to" language does not apply to magazines; indeed, "magazine" is not defined by either the Guidelines or the statute. *See* 18 U.S.C. § 921(a) & USSG § 2K2.1 app. n. 1. Rather, the requirements of the enhancement as relates to magazines are stated in the notes, and are, as discussed above, determinedly backward-looking to the moment of the offense: whether "at the time of the offense" there "was attached" or in close proximity to the firearm magazine "that could accept more than 15 rounds of ammunition." *See* USSG § 2K2.1 app. n. 2. The Eighth Circuit's decision in *Davis* says no different.

The Eight Circuit's unpublished decision in *United States v. Torres*, 489 F. App'x 968 (8th Cir. 2012), is also about the definition of a firearm, and so also has nothing to say about magazines. The *Torres* defendant was apprehended with a semiautomatic rifle and a large-capacity magazine in his trunk. *Id.* at 969. There was no dispute that the magazine could accept more than 15 rounds at the time of the offense. *Id.* Rather, the defendant contended that the firearm was not designed to be capable of accepting the magazine. *Id.* at 970. The Eighth Circuit panel rejected that contention based on a video showing an officer following a brief procedure to attach the magazine to the rifle and then fire it. *Id.* Like *Davis*, *Torres* does nothing to suggest that a magazine that is not capable of accepting more than 15 rounds at the time of the offense could nonetheless be treated as a large-capacity magazine.

Accordingly, in addition to its clear factual error about the capacity of the magazine, the district court also misinterpreted § 2K2.1 and reversibly erred by relying on *Davis* and *Torres* to consider what the magazine could accept if it was modified, instead of what the government actually proved (or failed to prove) it could do "at the time of the offense."

## VII. CONCLUSION

For the reasons stated above, appellant Francisco Lucas, Jr., respectfully requests that this Court vacate his sentence and remand for resentencing under the correct base offense level at USSG § 2K2.1(a)(6)(A).

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 11, 2022        By  */s/ SONAM HENDERSON*
                               Sonam_Henderson@fd.org
                               Deputy Federal Public Defender
                               Attorney for Defendant-Appellant

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is unaware of any pending case

presenting an issue related to those raised in this brief.


DATED: July 11, 2022                    */s/ Sonam Henderson*
                                        SONAM HENDERSON

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 5464 words.


DATED:  July 11, 2022                    */s/ Sonam Henderson*
                                                        SONAM HENDERSON

**INDEX OF ADDENDUM**

USSG § 2K2.1 ............................................................................................. A1

18 U.S.C. § 921 ......................................................................................... A9

United States Code Annotated
  Federal Sentencing Guidelines (Refs & Annos)
    Chapter Two. Offense Conduct (Refs & Annos)
      Part K. Offenses Involving Public Safety
        2. Firearms

USSG, § 2K2.1, 18 U.S.C.A.

§ 2K2.1. Unlawful Receipt, Possession, or Transportation of Firearms or
Ammunition; Prohibited Transactions Involving Firearms or Ammunition

Currentness

**(a)** Base Offense Level (Apply the Greatest):

**(1)** 26, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

**(2)** 24, if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

**(3)** 22, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense;

**(4)** 20, if--

**(A)** the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense; or

**(B)** the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) firearm that is described in 26 U.S.C. § 5845(a); and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense; (II) is convicted under 18 U.S.C. § 922(d); or (III) is convicted under 18 U.S.C. § 922(a) (6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

**(5)** 18, if the offense involved a firearm described in 26 U.S.C. § 5845(a);

**(6)** 14, if the defendant (A) was a prohibited person at the time the defendant committed the instant offense; (B) is convicted under 18 U.S.C. § 922(d); or (C) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense

A1

with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

**(7)** 12, except as provided below; or

**(8)** 6, if the defendant is convicted under 18 U.S.C. § 922(c), (e), (f), (m), (s), (t), or (x)(1), or 18 U.S.C. § 1715.

**(b)** Specific Offense Characteristics

**(1)** If the offense involved three or more firearms, increase as follows:

| Number of Firearms | Increase in Level |
|---|---|
| **(A)** 3-7......................................................................................................................... | add 2 |
| **(B)** 8-24....................................................................................................................... | add 4 |
| **(C)** 25-99..................................................................................................................... | add 6 |
| **(D)** 100-199................................................................................................................. | add 8 |
| **(E)** 200 or more........................................................................................................... | add 10. |

**(2)** If the defendant, other than a defendant subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5), possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition, decrease the offense level determined above to level 6.

**(3)** If the offense involved--

**(A)** a destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile, increase by 15 levels; or

**(B)** a destructive device other than a destructive device referred to in subdivision (A), increase by 2 levels.

**(4)** If any firearm (A) was stolen, increase by 2 levels; or (B) had an altered or obliterated serial number, increase by 4 levels.

The cumulative offense level determined from the application of subsections (b)(1) through (b)(4) may not exceed level 29, except if subsection (b)(3)(A) applies.

**(5)** If the defendant engaged in the trafficking of firearms, increase by 4 levels.

**(6)** If the defendant--

**(A)** possessed any firearm or ammunition while leaving or attempting to leave the United States, or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States; or

**(B)** used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense,

increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18.

**(7)** If a recordkeeping offense reflected an effort to conceal a substantive offense involving firearms or ammunition, increase to the offense level for the substantive offense.

**(c)** Cross Reference

(1) If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply--

(A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above; or

(B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

## CREDIT(S)

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1992; November 1, 1993; November 1, 1995; November 1, 1997; November 1, 1998; November 1, 2000; November 1, 2001; November 1, 2004; November 1, 2005; November 1, 2006; November 1, 2007; November 1, 2010; November 1, 2011; November 1, 2014; November 1, 2015; November 1, 2016.)

## COMMENTARY

<***Statutory Provisions:*** 18 U.S.C. §§ 922, (a)-(p), (r)-(w), (x)(1), 924(a), (b), (e)-(i), (k)-(o), 1715, 2332g; 26 U.S.C. § 5861(a)-(l). For additional statutory provisions, see Appendix A (Statutory Index).>

<*Application Notes:*>

<**1. Definitions.**--For purposes of this guideline:>

<"Ammunition" has the meaning given that term in 18 U.S.C. § 921(a)(17)(A).>

<"Controlled substance offense" has the meaning given that term in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2 (Definitions of Terms Used in Section 4B1.1).>

<"Crime of violence" has the meaning given that term in § 4B1.2(a) and Application Note 1 of the Commentary to § 4B1.2.>

<"Destructive device" has the meaning given that term in 26 U.S.C. § 5845(f).>

<"Felony conviction" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed. A conviction for an offense committed at age eighteen years or older is an adult conviction. A conviction for an offense committed prior to age eighteen years is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted (e.g., a federal conviction for an offense committed prior to the defendant's eighteenth birthday is an adult conviction if the defendant was expressly proceeded against as an adult).>

<"Firearm" has the meaning given that term in 18 U.S.C. § 921(a)(3).>

<**2. Semiautomatic Firearm That Is Capable of Accepting a Large Capacity Magazine.**--For purposes of subsections (a)(1), (a)(3), and (a)(4), a "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm. This definition does not include a semiautomatic firearm with an attached tubular device capable of operating only with .22 caliber rim fire ammunition.>

<**3. Definition of "Prohibited Person".**--For purposes of subsections (a)(4)(B) and (a)(6), "prohibited person" means any person described in 18 U.S.C. § 922(g) or § 922(n).>

<**4. Application of Subsection (a)(7).**--Subsection (a)(7) includes the interstate transportation or interstate distribution of firearms, which is frequently committed in violation of state, local, or other federal law restricting the possession of firearms, or for some other underlying unlawful purpose. In the unusual case in which it is established that neither avoidance of state, local, or other federal firearms law, nor any other underlying unlawful purpose was involved, a reduction in the base offense level to no lower than level 6 may be warranted to reflect the less serious nature of the violation.>

<**5. Application of Subsection (b)(1).**--For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer.>

<**6. Application of Subsection (b)(2).**--Under subsection (b)(2), "lawful sporting purposes or collection" as determined by the surrounding circumstances, provides for a reduction to an offense level of 6. Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for

A4

offenses involving firearms), and the extent to which possession was restricted by local law. Note that where the base offense level is determined under subsections (a)(1)-(a)(5), subsection (b)(2) is not applicable.>

<**7. Destructive Devices.--**A defendant whose offense involves a destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) (e.g., subsection (a)(1), (a)(3), (a)(4)(B), or (a)(5)), and the applicable enhancement under subsection (b)(3). Such devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons.>

<Offenses involving such devices cover a wide range of offense conduct and involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported. For example, a pipe bomb in a populated train station creates a substantially greater risk to the public welfare, and a substantially greater risk of death or serious bodily injury, than an incendiary device in an isolated area. In a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created, an upward departure may be warranted. See also, §§ 5K2.1 (Death), 5K2.2 (Physical Injury), and 5K2.14 (Public Welfare).>

<**8. Application of Subsection (b)(4)**>
  <**(A) Interaction with Subsection (a)(7).--**If the only offense to which § 2K2.1 applies is 18 U.S.C. § 922(i), (j), or (u), or 18 U.S.C. § 924(l) or (m) (offenses involving a stolen firearm or stolen ammunition) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(A). This is because the base offense level takes into account that the firearm or ammunition was stolen. However, if the offense involved a firearm with an altered or obliterated serial number, apply subsection (b)(4)(B).>

  <Similarly, if the offense to which § 2K2.1 applies is 18 U.S.C. § 922(k) or 26 U.S.C. § 5861(g) or (h) (offenses involving an altered or obliterated serial number) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(B). This is because the base offense level takes into account that the firearm had an altered or obliterated serial number. However, if the offense involved a stolen firearm or stolen ammunition, apply subsection (b)(4)(A).>

  <**(B) Knowledge or Reason to Believe.--**Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number.>

<**9. Application of Subsection (b)(7).--**Under subsection (b)(7), if a record-keeping offense was committed to conceal a substantive firearms or ammunition offense, the offense level is increased to the offense level for the substantive firearms or ammunition offense (e.g., if the defendant falsifies a record to conceal the sale of a firearm to a prohibited person, the offense level is increased to the offense level applicable to the sale of a firearm to a prohibited person).>

<**10. Prior Felony Convictions.--**For purposes of applying subsection (a)(1), (2), (3), or (4)(A), use only those felony convictions that receive criminal history points under § 4A1.1(a), (b), or (c). In addition, for purposes of applying subsection (a)(1) and (a)(2), use only those felony convictions that are counted separately under § 4A1.1(a), (b), or (c). See § 4A1.2(a)(2).>

<Prior felony conviction(s) resulting in an increased base offense level under subsection (a)(1), (a)(2), (a)(3), (a)(4)(A), (a)(4)(B), or (a)(6) are also counted for purposes of determining criminal history points pursuant to Chapter Four, Part A (Criminal History).>

A5

<**11. Upward Departure Provisions.--**An upward departure may be warranted in any of the following circumstances: (A) the number of firearms substantially exceeded 200; (B) the offense involved multiple National Firearms Act weapons (e.g., machineguns, destructive devices), military type assault rifles, non-detectable ("plastic") firearms (defined at 18 U.S.C. § 922(p)); (C) the offense involved large quantities of armor-piercing ammunition (defined at 18 U.S.C. § 921(a)(17)(B)); or (D) the offense posed a substantial risk of death or bodily injury to multiple individuals (see Application Note 7).>

<**12. Armed Career Criminal.--**A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an Armed Career Criminal. See § 4B1.4.>

<**13. Application of Subsection (b)(5).--**>

<**(A) In General.--**Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant--->
   <**(i)** transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and>

   <**(ii)** knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual--->
      <**(I)** whose possession or receipt of the firearm would be unlawful; or>

      <**(II)** who intended to use or dispose of the firearm unlawfully.>

<**(B) Definitions.--**For purposes of this subsection:>

<"Individual whose possession or receipt of the firearm would be unlawful" means an individual who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status. "Crime of violence" and "controlled substance offense" have the meaning given those terms in § 4B1.2 (Definitions of Terms Used in Section 4B1.1). "Misdemeanor crime of domestic violence" has the meaning given that term in 18 U.S.C. § 921(a)(33)(A).>

<The term "defendant", consistent with § 1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.>

<**(C) Upward Departure Provision.--**If the defendant trafficked substantially more than 25 firearms, an upward departure may be warranted.>

<**(D) Interaction with Other Subsections.--**In a case in which three or more firearms were both possessed and trafficked, apply both subsections (b)(1) and (b)(5). If the defendant used or transferred one of such firearms in connection with another felony offense (i.e., an offense other than a firearms possession or trafficking offense) an enhancement under subsection (b)(6)(B) also would apply.>

<**14. Application of Subsections (b)(6)(B) and (c)(1).--**>

A6

<**(A) In General.**--Subsections (b)(6)(B) and (c)(1) apply if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively. However, subsection (c)(1) contains the additional requirement that the firearm or ammunition be cited in the offense of conviction.>

<**(B) Application When Other Offense is Burglary or Drug Offense.**--Subsections (b)(6)(B) and (c)(1) apply (i) in a case in which a defendant who, during the course of a burglary, finds and takes a firearm, even if the defendant did not engage in any other conduct with that firearm during the course of the burglary; and (ii) in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, application of subsections (b)(6)(B) and, if the firearm was cited in the offense of conviction, (c)(1) is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively.>

<**(C) Definitions.**-->

<"Another felony offense", for purposes of subsection (b)(6)(B), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained.>

<"Another offense", for purposes of subsection (c)(1), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, regardless of whether a criminal charge was brought, or a conviction obtained.>

<**(D) Upward Departure Provision.**--In a case in which the defendant used or possessed a firearm or explosive to facilitate another firearms or explosives offense (e.g., the defendant used or possessed a firearm to protect the delivery of an unlawful shipment of explosives), an upward departure under § 5K2.6 (Weapons and Dangerous Instrumentalities) may be warranted.>

<**(E) Relationship Between the Instant Offense and the Other Offense.**--In determining whether subsections (b)(6)(B) and (c)(1) apply, the court must consider the relationship between the instant offense and the other offense, consistent with relevant conduct principles. See § 1B1.3(a)(1)-(4) and accompanying commentary.>

<In determining whether subsection (c)(1) applies, the court must also consider whether the firearm used in the other offense was a firearm cited in the offense of conviction.>

<For example:>

<**(i) Firearm Cited in the Offense of Conviction.** Defendant A's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant A used the shotgun in connection with a robbery. Ordinarily, under these circumstances, subsection (b)(6)(B) applies, and the cross reference in subsection (c)(1) also applies if it results in a greater offense level.>

<Ordinarily, the unlawful possession of the shotgun on February 10 will be "part of the same course of conduct or common scheme or plan" as the unlawful possession of the same shotgun on October 15. See § 1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to § 1B1.3). The use of the shotgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsections (b)(6)(B) and (c)(1). See § 1B1.3(a)(4) ("any other information specified in the applicable guideline").>

<**(ii) Firearm Not Cited in the Offense of Conviction.** Defendant B's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant B

unlawfully possessed a handgun (not cited in the offense of conviction) and used the handgun in connection with a robbery.>

<**Subsection (b)(6)(B).** In determining whether subsection (b)(6)(B) applies, the threshold question for the court is whether the two unlawful possession offenses (the shotgun on October 15 and the handgun on February 10) were "part of the same course of conduct or common scheme or plan". See § 1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to § 1B1.3).>

<If they were, then the handgun possession offense is relevant conduct to the shotgun possession offense, and the use of the handgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsection (b)(6)(B). See § 1B1.3(a)(4) ("any other information specified in the applicable guideline"). Accordingly, subsection (b)(6)(B) applies.>

<On the other hand, if the court determines that the two unlawful possession offenses were not "part of the same course of conduct or common scheme or plan," then the handgun possession offense is not relevant conduct to the shotgun possession offense and subsection (b)(6)(B) does not apply.>

<**Subsection (c)(1).** Under these circumstances, the cross reference in subsection (c)(1) does not apply, because the handgun was not cited in the offense of conviction.>

<**15. Certain Convictions Under 18 U.S.C. §§ 922(a)(6), 922(d), and 924(a)(1)(A).**--In a case in which the defendant is convicted under 18 U.S.C. §§ 922(a)(6), 922(d), or 924(a)(1)(A), a downward departure may be warranted if (A) none of the enhancements in subsection (b) apply, (B) the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense, and (C) the defendant received no monetary compensation from the offense.>

Notes of Decisions (712)

Federal Sentencing Guidelines, § 2K2.1, 18 U.S.C.A., FSG § 2K2.1
As amended to 3-15-22.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 921

§ 921. Definitions

Effective: June 25, 2022 to September 30, 2022
Currentness

**(a)** As used in this chapter--

**(1)** The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

**(2)** The term "interstate or foreign commerce" includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

**(3)** The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**(4)** The term "destructive device" means--

  **(A)** any explosive, incendiary, or poison gas--

    **(i)** bomb,

    **(ii)** grenade,

    **(iii)** rocket having a propellant charge of more than four ounces,

    **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,

    **(v)** mine, or

**(vi)** device similar to any of the devices described in the preceding clauses;

**(B)** any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

**(C)** any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

**(5)** The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

**(6)** The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches.

**(7)** The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

**(8)** The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

**(9)** The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.

**(10)** The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

**(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms,

or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

**(12)** The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

**(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

**(14)** The term "indictment" includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

**(15)** The term "fugitive from justice" means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

**(16)** The term "antique firearm" means--

**(A)** any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

**(B)** any replica of any firearm described in subparagraph (A) if such replica--

**(i)** is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

**(ii)** uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

**(C)** any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

**(17)(A)** The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

**(B)** The term "armor piercing ammunition" means--

**(i)** a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

**(ii)** a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

**(C)** The term "armor piercing ammunition" does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

**(18)** The term "Attorney General" means the Attorney General of the United States [1]

**(19)** The term "published ordinance" means a published law of any political subdivision of a State which the Attorney General determines to be relevant to the enforcement of this chapter and which is contained on a list compiled by the Attorney General, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

**(20)** The term "crime punishable by imprisonment for a term exceeding one year" does not include--

**(A)** any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

**(B)** any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(21)** The term "engaged in the business" means--

**(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

**(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

**(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

**(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended--

**(i)** to intimidate or coerce a civilian population;

**(ii)** to influence the policy of a government by intimidation or coercion; or

**(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the

regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended--

    **(i)** to intimidate or coerce a civilian population;

    **(ii)** to influence the policy of a government by intimidation or coercion; or

    **(iii)** to affect the conduct of a government by assassination or kidnapping.

**(24)** The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

**(25)** The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

**(26)** The term "school zone" means--

**(A)** in, or on the grounds of, a public, parochial or private school; or

**(B)** within a distance of 1,000 feet from the grounds of a public, parochial or private school.

**(27)** The term "school" means a school which provides elementary or secondary education, as determined under State law.

**(28)** The term "motor vehicle" has the meaning given such term in section 13102 of title 49, United States Code.

**(29)** The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

**(30)** The term "handgun" means--

**(A)** a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

**(B)** any combination of parts from which a firearm described in subparagraph (A) can be assembled.

**[(31)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000.]

**(32)** The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.

**(33)(A)** Except as provided in subparagraphs (B) and (C), the term "misdemeanor crime of domestic violence" means an offense that--

**(i)** is a misdemeanor under Federal, State, or Tribal law; and

**(ii)** has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim.

**(B)(i)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless--

**(I)** the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

**(II)** in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

**(aa)** the case was tried by a jury, or

**(bb)** the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

**(ii)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(C)** A person shall not be considered to have been convicted of a misdemeanor crime of domestic violence against an individual in a dating relationship for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the

person has been pardoned or has had firearm rights restored unless the expungement, pardon, or restoration of rights expressly provides that the person may not ship, transport, possess, or receive firearms: *Provided*, That, in the case of a person who has not more than 1 conviction of a misdemeanor crime of domestic violence against an individual in a dating relationship, and is not otherwise prohibited under this chapter, the person shall not be disqualified from shipping, transport, possession, receipt, or purchase of a firearm under this chapter if 5 years have elapsed from the later of the judgment of conviction or the completion of the person's custodial or supervisory sentence, if any, and the person has not subsequently been convicted of another such offense, a misdemeanor under Federal, State, Tribal, or local law which has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, or any other offense that would disqualify the person under section 922(g). The national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act (34 U.S.C. 40901) shall be updated to reflect the status of the person. Restoration under this subparagraph is not available for a current or former spouse, parent, or guardian of the victim, a person with whom the victim shares a child in common, a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or a person similarly situated to a spouse, parent, or guardian of the victim.

**(34)** The term "secure gun storage or safety device" means--

**(A)** a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;

**(B)** a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or

**(C)** a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

**(35)** [2] The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.

**(37)(A)** [2] The term "dating relationship" means a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature.

**(B)** Whether a relationship constitutes a dating relationship under subparagraph (A) shall be determined based on consideration of--

**(i)** the length of the relationship;

**(ii)** the nature of the relationship; and

**(iii)** the frequency and type of interaction between the individuals involved in the relationship.

**(C)** A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a dating relationship under subparagraph (A).

**(b)** For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

## CREDIT(S)

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 226; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1214; Pub.L. 93-639, § 102, Jan. 4, 1975, 88 Stat. 2217; Pub.L. 99-308, § 101, May 19, 1986, 100 Stat. 449; Pub.L. 99-360, § 1(b), July 8, 1986, 100 Stat. 766; Pub.L. 99-408, § 1, Aug. 28, 1986, 100 Stat. 920; Pub.L. 101-647, Title XVII, § 1702(b)(2), Title XXII, § 2204(a), Nov. 29, 1990, 104 Stat. 4845, 4857; Pub.L. 103-159, Title I, § 102(a)(2), Nov. 30, 1993, 107 Stat. 1539; Pub.L. 103-322, Title XI, §§ 110102(b), 110103(b), 110105(2), 110401(a), 110519, Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1997, 1999, 2000, 2014, 2020, 2150; Pub.L. 104-88, Title III, § 303(1), Dec. 29, 1995, 109 Stat. 943; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, § 658(a)], Sept. 30, 1996, 110 Stat. 3009-314, 3009-371; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 119(a)], (h) [Title I, § 115], Oct. 21, 1998, 112 Stat. 2681-50, 2681-69, 2681-480, 2681-490; Pub.L. 107-273, Div. C, Title I, § 11009(e)(1), Nov. 2, 2002, 116 Stat. 1821; Pub.L. 107-296, Title XI, § 1112(f)(1) to (3), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-162, Title IX, § 908(a), Jan. 5, 2006, 119 Stat. 3083; Pub.L. 115-232, Div. A, Title VIII, § 809(e)(2), Aug. 13, 2018, 132 Stat. 1842; Pub.L. 117-159, Div. A, Title II, §§ 12002, 12005(a), (c), June 25, 2022, 136 Stat. 1324, 1332.)

### Footnotes

1    So in original. Probably should be followed by a period.

2    So in original. Pub.L. 117-159, § 12005(a)(22), enacted par. (a)(37). There is no par. (a)(36).

18 U.S.C.A. § 921, 18 USCA § 921
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

**End of Document**                                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

A17